IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | CASE NO. 2:09-cv-683 |
| | ) | |
| BISWAS, *et al.*, | ) | (WO- Do Not Publish) |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

This cause is before the Court on Plaintiff United States of America's ("the Government") Motion for Summary Judgment (Doc. # 25); Defendant Chandi Biswas's ("Biswas") Motion for Summary Judgment (Doc. # 27); and Defendant Frankie Roberson's ("Roberson") Motion for Summary Judgment (Doc. # 29), all filed July 23, 2010. Defendant Kenneth Scott ("Scott"), who is unrepresented by counsel in this matter, did not file a Motion for Summary Judgment. For the reasons set out below, these Motions are each DENIED.

**II. JURISDICTION AND VENUE**

This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1345 and 42 U.S.C. § 3614. The parties do not assert that this Court lacks personal jurisdiction over them, and there is no dispute that venue is proper pursuant to 28 U.S.C. § 1391(b).

### III. LEGAL STANDARD

Summary judgment pursuant to Federal Rule of Civil Procedure 56(c) is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. The Court must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). After the nonmoving party has responded to the motion

for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

## IV. FACTS AND PROCEDURAL HISTORY

Biswas owns and operates several residential apartment complexes in Alabama. (Doc. # 27 Ex. F). One of these, the Rolling Oaks Apartments in Clanton, Alabama, is the subject of this lawsuit. *Id.* Defendants Scott and Roberson were employees of Rolling Oaks during all times relevant to this lawsuit.[1] (Doc. # 28 ¶ 6, 8). Scott served as the part-time property manager, the employee in charge of renting apartments, maintaining leases, collecting rents, etc. (Doc. # 28 ¶ 6). Roberson served as the property's maintenance technician, but also performed managerial duties when Scott was unavailable to do so. (Doc. # 26 Exhibit B at 103–5). These managerial duties included informing potential tenants about rent prices and showing potential tenants vacant apartments. *Id.*

Between July 2008 and January 2009, the United States Department of Justice conducted a series of fair housing tests at Rolling Oaks Apartments. (Doc. # 26, Ex. L). Testing is "a simulation of a housing transaction that compares responses given by

---

[1] The Court has used the term "employee" out of convenience in describing the facts of this case. The Court makes no determination at this time about whether a principal/agent relationship existed between the Defendants.

housing providers and staff to different types of home-seekers in order to determine whether illegal discrimination is occurring." *Id.* Four whites and three African-Americans were used as testers at Rolling Oaks. *Id.* All wore sound recording equipment during the tests, and therefore captured the statements made by Roberson and Scott on tape. *Id.* On October 1, 2008, Roberson was approached by white tester Mark Markley ("Markley"). (Doc. # 26). Because Scott was not in the office that day, Roberson gave Markley information about a two-bedroom apartment and showed Markley around a vacant unit. *Id.* During the test, Roberson stated:

> [A] lot of people are moving up from that area over there over to here because they're —they have a lot of—and a lot of it is just—it's prejudism (sic) to be honest with you but they have a lot of Mexicans and Black folks and such other there and a lot of folks just don't want to be around them. I mean, this is the South.
>
> I mean, this is the South. So you have to understand to some degree where they're coming from, I guess, but I've never really had any trouble with Black folks or Mexicans, either one. They haven't bothered me, either one of them. But I've worked with just about everybody, so I guess, different kinds of people. So most of them, I don't have any trouble with, but a lot of folks do. And very few—there's very few Black people around here that can afford much of anything over $350.00 anyway.

(Doc. # 26 Ex. J, K). Roberson went on to describe the number and location of apartments in the Rolling Oaks complex in which African American tenants lived, saying:

> You know, like I think in the whole complex I doubt there's—let's see, well, actually in that building there's some Black folks that live in that building, on apartment in Building 3. Now Building 8, there's no Black people that live in it. There's probably four apartments in the whole place

> where Black people live out here but they're nice, don't have any trouble
> out of them, you know. And we've had Mexicans live here before but now
> we don't have any here now, but they always paid their rent ahead of time.
> Never had any trouble out of them, they were quiet, but you know, like I
> say, you're in the South and you run across folks sometimes that don't want
> to be around anybody else.

(Doc. # 26 Ex. J, K).

On October 2, 2008, Markley returned to Rolling Oaks to try and speak with Scott. At the time Markley visited, there was a sign on the door of the Rolling Oaks Leasing Office warning potential applicants that a $30 application fee was required, and that police background and credit checks would be performed. (Doc. # 26 Ex. C at 69-72). This sign was displayed prominently since early 2008, and was intended to deter individuals with criminal histories from applying for an apartment at Rolling Oaks. (Doc. # 28 Ex. B at 73). Scott also hoped the sign would deter individuals from taking several copies of the application form with no intention to fill it out and return it. *Id.* at 90. In response to the sign, Markley questioned Scott about the need for a background check. (Doc. # 26 Ex. E, F). Scott responded that:

> "there ain't going to be none. That's just there mainly to throw
> off—because we get Blacks coming in here, you know, come in, want your
> application and they see that and they just—a lot of them—a lot of times
> people see that and they just turn around and walk away."

*Id*.

On January 13, 2009, a white tester named Mikchel Aucoin ("Aucoin") visited

Rolling Oaks. (Doc. # 26 Ex. G, H). He spoke with Scott about available units and took a tour of the complex. *Id.* When describing the other apartment complexes in town, Scott warned Aucoin to stay away from the Peachtree and Inverness Apartments. *Id.* He stated that "[t]hey have a lot of Blacks at Emernus (sic). Well, Peachtree and Emerness are all Section 8. . . .They're 90 percent Black." *Id.* Scott also said that here, at the Rolling Oaks apartment complex, "[w]e've got just enough to keep them off our butt." *Id.*

Scott and Roberson also each spoke to African-American testers on two occasions. (Doc. # 26). According to the Government, neither man made comments about the racial composition of either Rolling Oaks or surrounding apartment complexes when speaking to African-American testers. (Doc. # 26).

On July 21, 2009, the Government filed this lawsuit against Biswas, Scott, and Roberson, alleging that the Defendants had engaged in a pattern or practice of discrimination or denial of rights to a group of persons because of race or color, in violation of 42 U.S.C. § 3601, *et seq.* in the rental of dwelling units at Rolling Oaks. (Doc. # 1).

## V. DISCUSSION

### A. *The FHA:*

The Government alleges that defendants Scott and Roberson made recorded statements to testers that violated the Fair Housing Act ("FHA"). The FHA provides in part that it shall be unlawful

6

> to make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race [or] color . . . or an intention to make any such preference, limitation, or discrimination.

42 U.S.C. § 3604. The FHA gives the Attorney General standing to enforce rights under the FHA against "any person or group of persons . . . engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted" by the FHA. 42 U.S.C. § 3614(a). The Attorney General is also permitted to bring suit when a purported violation of the FHA "raises an issue of general public importance." *Id.*

The Government bears the burden of proof on whether the defendants' conduct rises to the level of a pattern of practice of discrimination. *U.S. v. Habersham Props., Inc.*, 319 F. Supp. 2d 1366, 1372 (N.D. Ga. 2003). In order to establish a pattern or practice, the Government must show, by a preponderance of the evidence, that discrimination was the defendants' "standard operating procedure, the regular rather than the unusual practice." *Id.* (*citing Int'l Bhd. of Teamsters v. U.S.*, 431 U.S. 324, 336 (1977)). There is no threshold number of incidents that must occur before the Government can bring suit based upon a pattern or practice of discrimination. *Id.* at 1372–73. However, isolated, accidental or sporadic misconduct will not be enough to establish a pattern or practice. *Id.* Whether a defendant's conduct rises to the level of pattern or practice is a question of fact for the jury to decide. *Id.* at 1373.

If the Government has standing to bring suit, it must then prove that defendants engaged in discriminatory conduct that violated the FHA. The *McDonnell Douglas* burden shifting analysis applies to cases brought pursuant to the FHA. *Dep't of Hous. and Urban Dev. v. Blackwell*, 908 F.2d 864, 870 (11th Cir. 1990). First, the Government must establish a prima facie case of discrimination by a preponderance of the evidence. *Id.* If the Government can do so, the burden then shifts to the defendant to articulate a nondiscriminatory reason for his actions. *Id.* Third, if the defendant satisfies his burden, the Government must prove by the preponderance of the evidence that the reasons given by the defendant are pretextual. *Id.*

Biswas did not himself make any allegedly discriminatory statements, and the Government seeks to hold him vicariously liable for the statements made by Roberson and Scott. That the FHA allows for vicarious liability has long been settled. *Meyer v. Holley*, 537 U.S. 280, 285 (2003). Traditional principles of agency law determine whether a principal can be held liable without fault under the FHA for the actions of his agents. *Id.* at 290–91. Therefore, to hold Biswas liable for the actions of Roberson and Scott, the Government would have to show that an agency relationship existed between Biswas and Roberson and Biswas and Scott.

### B. Contentions of the parties:

Defendant Biswas argues in his motion for summary judgment that 1) the Government cannot establish by a preponderance of the evidence that the Defendants

8

engaged in a pattern or practice of discrimination, and 2) even if the Government does have standing to bring this suit, the actions taken by Roberson and Scott were not discriminatory. (Doc. # 27). The Court reads the second argument to be that the Government would not be able to establish a prima facie case of discrimination against the Defendants.

Defendant Roberson argues in his motion for summary judgment 1) the Government cannot prove a prima facie case of discrimination against him, and 2) even if the Government does satisfy its burden, Roberson can rebut the case of discrimination with race-neutral explanations for the recorded statements he made. (Doc. # 29).

Last, the Government argues in its motion for summary judgment that it can establish both standing to sue and a prima facie case of discrimination against the Defendants. (Doc. # 26). The parties' arguments can be categorized into two groups: 1) those pertaining to the Government's prima facie case of discrimination, and 2) those pertaining to the Government's standing to bring suit. These will be discussed in turn.

### C. *The Government's prima facie case of discrimination:*

The Government has joined Biswas as a defendant in the lawsuit based on a theory of vicarious liability. Therefore, the prima facie case of discrimination against Biswas must be built on a prima facie case of discrimination against Roberson and Scott. To succeed against Roberson and Scott as individual defendants, the Government need only establish a prima facie case of discrimination as to Roberson and Scott, respectively,

9

in addition to establishing a pattern or practice.

    *1. Evidence of discrimination by Scott:*

The evidence presented against Scott includes the recorded statements made to testers Markley and Aucoin. When Markley visited the leasing office, a sign read that a $30 application fee, police background check, and credit check would be required. (Doc. # 26, Ex. E, F). Scott discussed with Markley the sign posted on the door, saying that while the sign indicated that a police background check was a requirement for all applicants, for Markley "there ain't going to be none. That's just there mainly to throw off—because we get Blacks coming in here, you know, come in, want your application and they see that and they just—a lot of them—a lot of times people see that and they just turn around and walk away." (Doc. # 26 Ex. E, F). Scott could have been saying that the sign was posted to keep African Americans from applying for apartments at Rolling Oaks. This would clearly indicate a preference regarding the race of Rolling Oaks tenants. According to his deposition testimony, however, the sign was really meant to deter individuals from taking applications unless they were serious about renting from Rolling Oaks. (Doc. # 28 Ex. B at 89–90). Because there was no copy machine in the leasing office where Scott worked, he would have to drive to another location to make more copies of the application form each time he ran out. *Id.* Therefore, Scott's comments could also be interpreted as frustration with would-be applicants who are not

serious about renting at Rolling Oaks.

During a separate test, Scott told Aucoin to stay away from two other apartment complexes in town, because those complexes were Section 8 housing and 90% of the residents were black.  (Doc. # 26 Ex. G, H).  In comparison, Scott said, Rolling Oaks had just enough black residents to "keep them off our butts." *Id.*  Biswas argues in his motion for summary judgment that Scott's statement was simply an acknowledgment that Rolling Oaks complied with "legal housing requirements—nothing more, and nothing less." (Doc. # 28 at 18).  However, Scott could also have been using the low number of African American residents to entice applicants to rent from Rolling Oaks.

Both of Scott's statements are ambiguous, and some inferences need to be drawn in order to determine whether or not the statements are discriminatory.  On a motion for summary judgment, all inferences that can be drawn from the evidence must be done so in favor of the nonmovant.  *Anderson*, 477 U.S. at 255.  Doing so requires in this case that the Court leave the question of whether the Government established a prima facie case of discrimination against Scott to the jury.

B.  *Evidence of discrimination by Roberson:*

The Government has also tried to establish a prima facie case of discrimination against Roberson.  The evidence raised against Roberson in the Government's motion for summary judgment comes entirely from his recorded conversation with tester Markely.

11

During this conversation, Roberson explains that many residents have chosen to move to Rolling Oaks from other complexes because Rolling Oaks has fewer minority residents. (Doc. # 26 Ex. J, K). He then proceeds to point out each building in the complex where an African American tenant lives. Roberson could have been saying that Rolling Oaks chooses not to have minority residents in an attempt to appeal to potential residents. But Roberson could also have simply been stating a fact about prejudice in the community. Again, there is a material issue of fact regarding what Roberson meant in his discussions with Markley. Therefore, the Court must deny summary judgment with regards to the Government's prima facie case of discrimination against Roberson.

### D. *The Government's standing to bring suit:*

Biswas has argued that the Government does not have standing to bring suit, because the Defendants did not engage in a pattern or practice of discrimination in violation of the Fair Housing Act. This question is generally one for the jury. *Habersham Props., Inc.*, 319 F. Supp. 2d at 1372. Because the Court cannot determine as a matter of law whether Roberson and Scott engaged in any kind of discrimination in violation of the FHA, the Court also cannot determine as a matter of law that the Defendants engaged in a pattern or practice of such discrimination.

The Government has presented some evidence of a pattern or practice of discrimination. On at least three visits to the Rolling Oaks complex, Scott or Roberson made arguably discriminatory statements. Also, Scott may have posted a sign on the door

to discourage African Americans from applying for leases at Rolling Oaks.  The sign was hung prominently on the door and, according to Scott's conversation with Markley, was effective in turning black potential applicants away.  This evidence is sufficient to raise a material issue of fact with regard to whether or not Defendants engaged in a pattern or practice of discrimination.  Therefore, this question must also be sent to the jury.

For the foregoing reasons, it is hereby ORDERED that Defendant Biswas's (Doc. # 27), Defendant Roberson's (Doc. # 29), and Plaintiff United States' (Doc. # 25) Motions for Summary Judgment are hereby DENIED.

Done this the 8th day of December, 2010.

      /s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE